**EARTH PROTECTOR, INC., Plaintiff,**

**v.**

**Robert T. JACOBS, in his official capacity as Regional Forester, United States Forest Service; James Sanders, in his official capacity as Forest Supervisor, Superior National Forest, United States Forest Service; and Constance Chaney, in her official capacity as District Ranger, Superior National Forest, United States Forest Service; Cusson Camp Company, Defendants,**

**and**

**Minnesota Timber Producers Association, Intervenor.**

**No. CIV. 98–1 JRT/RLE.**

United States District Court, D. Minnesota.

Feb. 3, 1998.

Richard B Bates, Bates Law Office, St Paul, MN, for Earth Protector Inc.

David Russell Oberstar, Fryberger Buchanan Smith & Frederick, Duluth, MN, for Minnesota Timber Producers Association.

Mary Trippler, Asst. U.S. Atty,, Office of the U.S. Atty., Minneapolis, MN, for remaining Defendants.

## MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

TUNHEIM, District Judge.

This case involves the sale by the United States Forest Service of 100 acres of timber in a 619–acre tract of white and red pine forest in the Superior National Forest in northeastern Minnesota. The site is referred to as the Little Alfie Project Area. Plaintiff, Earth Protector, Inc., is a Minnesota corporation formed for purposes of environmental advocacy and education. Earth Protector challenges the Forest Service's sale of designated timber in the Little Alfie Project Area to Cusson Camp Company, a sawmill located near Orr, Minnesota. Plaintiff claims that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, requires the Forest Service to prepare an Environmental Impact Statement ("EIS") prior to this sale of timber in the Little Alfie Project Area.

Earth Protectors, Inc. alleges it has over 3,000 members and that some of its members

live near and use parts of the Superior National Forest for recreation and scientific study. Plaintiff named as defendants three Forest Service employees in their official capacities and Cusson Camp. At a hearing on January 21, 1998, the Court granted a motion by the Minnesota Timber Producers Association ("MTPA") to intervene as a defendant.[1] The MTPA members are loggers involved in the harvest of trees, at least one of whom is likely to be hired by Cusson Camp to harvest the timber in the Little Alfie Project Area.

Earth Protectors, Inc. filed its complaint accompanied by motions for a temporary restraining order and a preliminary injunction on January 2, 1998. The Court subsequently granted plaintiff's motion for permission to file an amended complaint pursuant to Fed. R.Civ.P. 15(a). There are several motions before the Court. Plaintiff seeks preliminary relief prohibiting the cutting of timber at the Little Alfie site until the Forest Service completes an EIS. All three defendants oppose plaintiff's motion for temporary relief. The Forest Service defendants move for dismissal of plaintiff's complaint for failure to state a claim or for summary judgment. Cusson Camp also moves for summary judgment.[2]

## I. Statutory Framework

The United States Forest Service's management of the national forests is governed by the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1604–14. The NFMA requires that the Forest Service prepare land and resource management plans ("Forest Plans") for the national forests. 16 U.S.C. § 1604(a). The Forest Plans must "provide for multiple use and sustained yield of the products and services obtained [from national forests] in accordance with the National Forest Management Act, ... and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). The Multiple–Use Sustained Yield Act of 1960 requires the Forest Service to manage for uses including "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.

The Forest Service must prepare its land and resource management plans in accordance with NEPA. *See* 16 U.S.C. § 1604(g)(1). The purpose of NEPA is "to ensure that government agencies act on full information and that interested groups have access to such information." *Sierra Club v. United States Forest Service,* 46 F.3d 835, 837 n. 2 (8th Cir.1995). NEPA requires that federal agencies include an Environmental Impact Statement ("EIS") in every report on proposals for "major federal actions significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(2)(C). It does not impose substantive results on agencies such as the Forest Service. *Sierra Club,* 46 F.3d at 837 n. 2.

---

1. Plaintiff did not oppose a grant of permissive intervenor status to the Minnesota Timber Producers Association.

2. The Court has denied defendants' dispositive motions to the extent they alleged plaintiff lacks standing to pursue this claim. Plaintiff alleges it is a membership organization and submitted affidavits indicating that some of its members will suffer injury in fact if this sale is consummated. Such allegations are an adequate basis for standing to challenge the Forest Service's actions, as injury to aesthetic and environmental well-being is constitutionally cognizable injury in fact. *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Defendants argued that because the Minnesota Secretary of State had involuntarily dissolved the Earth Protectors, Inc. corporation at the time it filed this lawsuit, the corporation did not have the capacity to sue in its own name. Plaintiff's amended complaint states that Earth Protectors, Inc. has been restored to good standing; thus, this issue is now moot.

Defendant Cusson Camp also argued that plaintiff lacks standing because Minnesota statutes governing business and non-profit corporations do not allow a business corporation to have members. Although under Fed.R.Civ.P. 17(b) the capacity of a corporation to sue is determined by the law under which it is organized, this Court ruled that even if plaintiff does not have capacity to sue under Minnesota law, plaintiff could prosecute its claims under federal law under Rule 17(b). *See, e.g., Warth v. Seldin,* 422 U.S. 490, 522, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (associational standing); *Health Care Equalization Comm. of the Iowa Chiropractic Soc'y v. Iowa Medical Soc'y,* 501 F.Supp. 970, 976 (S.D.Iowa 1980) (citing federal substantive right exception to requirement that corporation have capacity to sue under state law), *aff'd* 851 F.2d 1020 (8th Cir.1988).

The Forest Service prepares an EIS for each national forest as part of the Forest Plan required by the NFMA. *Sharps v. United States Forest Service,* 823 F.Supp. 668, 675 (D.S.D.1993), *aff'd,* 28 F.3d 851 (8th Cir. 1994). For subsequent site-specific projects, an EIS is required only if the project will significantly affect the environment. *Sharps,* 28 F.3d at 852 n. 2 .; 40 C.F.R. § 1501.4. To determine if an EIS is necessary for a subsequent action, an agency may prepare an Environmental Assessment ("EA") to assist it in determining whether the impacts of a proposed project rise to the level of a major federal action. 40 C.F.R. §§ 1501.4, 1501.9; *see also Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213–14 (10th Cir.1997).

An EA is a concise public document that briefly discusses the relevant issues and either concludes that preparation of an EIS is necessary or concludes with a finding of no significant impact, in which case preparation of an EIS is unnecessary. *See Nat'l Audubon Soc'y v. Hoffman,* 132 F.3d 7, 1997 WL 781810 (2d Cir.1997); 40 C.F.R. § 1508.9. The EA should provide sufficient evidence and analysis for making that determination. 40 C.F.R. § 1508.9(a)(1). It must include brief discussions of the need for the proposal, of alternatives, and of the environmental impacts of the proposed action and the alternatives. 40 C.F.R. § 1508.9(b). When evaluating the significance of a proposed federal action, an agency should consider the impact in several contexts and should measure the intensity, or severity, of the impact by considering:

> impacts that may be both beneficial and adverse; ... the degree to which the proposed action affects public health or safety; ... unique characteristics of the geographic area, ... the degree to which the effects on the quality of the human environment are likely to be highly controversial; ... the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; ... the degree to which the action may establish a precedent for future actions with significant effects; ... whether the action is related to other actions with individually or cumulatively significant impacts; ... the degree to which the action

may adversely affect an endangered or threatened species or its habitat.

40 C.F.R. § 1508.27.

## II. The Little Alfie Project Area Timber Sale

Superior National Forest is divided into fifteen management areas pursuant to the 1986 Forest Plan. The Little Alfie site is located within a management area with a designated purpose "to emphasize land and resource conditions that will provide softwood and hardwood timber for paper, particle board, and fuelwood; provide habitat for moose and other native species requiring young forests; and provide opportunities in natural settings which may have modifications that are easily noticed to strongly dominant."

The Little Alfie timber sale began in 1995, when the Forest Service requested bids on the proposed Little Alfie timber harvest. Cusson Camp, the high bidder, was awarded the contract in August, 1995. Cusson Camp anticipated harvesting the trees during the winter of 1996–97. In December 1996, however, Earth Protector filed a lawsuit in federal court alleging that the Forest Service had not complied with NEPA and had not conducted an EIS for the proposed sale. The Forest Service temporarily suspended the Little Alfie sale, and the lawsuit was dismissed pending completion of an EA to determine if an EIS was necessary.

The Forest Service assembled an interdisciplinary team ("Team") of seven specialists who consulted with 23 specialists and members of the timber industry and conducted a public comment process. The Forest Service issued the resulting EA on August 6, 1997. The EA begins with a statement of the purpose and need for the federal action. The two purposes identified are to provide pine saw timber to the local and regional economy and to regenerate white pine and maximize its growth. The analysis of the decision to be made is explicitly "limited in scope to the purpose and need."

The decisions to be made were: (1) whether the management activities should be implemented at this time; (2) if not, which

alternative would best meet the project objectives and public concerns; and (3) whether the proposed action or chosen alternative will have a significant impact on the human environment. The Team chose to evaluate three major issues raised in the comments in depth, and to develop alternatives to the proposed action to address them. These issues were economics, including supplying timber to the economy and the value of not harvesting mature pine; white pine regeneration; and old growth.[3]

The Team then developed four alternatives to the proposed action. The information considered in developing these alternatives was: (1) the Forest Plan's goals, objectives, and desired future condition for the project area; (2) the public comments; (3) the legal standards that govern land use on national forests; and (4) the purpose and need for the proposed action. "Alternative 1" involves no action. It is included as "a baseline to compare the effects of the action alternatives."[4] "Alternative 2" is the original action, a shelterwood harvest of 100 acres, with the "minor change" of eliminating white pine from the proposed harvest. The 100 acres of red pine would be harvested to produce 721 million board feet of pine saw timber and 168 cords of pine pulpwood. "Alternative 3" is a similar harvest of 100 acres also reserving white pine, but harvests fewer trees, resulting in 395 million board feet of pine saw timber and 91 cords of pine pulpwood pro-

duction. "Alternative 4" proposes a clearcut of 37 acres of red pine and no action on the remaining 63 acres. Artificial planting of red pine would occur on the clearcut acres if necessary. This option would produce 430 million board feet of saw timber and 53 cords of pine pulpwood.

The Team recommended "Alternative 2," a plan to harvest 100 acres of mature red pine using the "shelterwood method."[5] LaCroix District Ranger Constance Chaney made the decision to adopt the team's recommendation. Chaney also determined that the sale involved "would not significantly impact the quality of the human environment" and that an EIS was therefore not necessary. The Forest Service proceeded with the sale to Cusson Camp, and the contract with Cusson Camp was amended to remove white pine from the sale.

Several environmental organizations, including Earth Protectors, appealed the finding of no significant impact within the Forest Service, as Forest Service regulations allow. An Appeal Review Officer reviewed the EA and Ranger Chaney's finding of no significant impact and recommended that it be affirmed. The Regional Forester, Robert T. Jacobs, also reviewed the decision and the appeal and affirmed the agency's decisions. Plaintiff then filed this lawsuit challenging the agency's final action.

3. Other issues considered, but not addressed in detail, were loss of the mature white pine component, white pine regeneration, blowdown of residual trees, age-class distribution, biodiversity/natural succession, soils, water quality, threatened, endangered and sensitive wildlife, wildlife, fisheries, recreation, visual quality, heritage resources, roads, other economics, air quality, and civil rights.

4. It appears that Alternative 1, no action, was never seriously considered as an option. In a list of alternatives considered but eliminated from further consideration, the EA includes a "no harvest alternative." The report states that this alternative "was considered but eliminated from further analysis because it would not meet the purpose and need of providing pine saw timber to the local economy." Nor was the decision considered comparatively with harvesting other stands because "the harvest of other forest types within or beyond the Little Alfie Project Area is

not part of the purpose and need of the proposed action."

5. Although the Forest Service notes that the harvest does not involve "clearcutting," shelterwood harvesting, like clearcutting, involves "even-aged management." See 36 C.F.R. § 219.3. The three types of even-aged management are clearcutting, seed tree cutting, and shelterwood cutting. Id. "Even under the least intrusive even-aged management technique, shelterwood cutting, only about sixteen trees per acre remain after a cut." Sierra Club v. Espy, 38 F.3d 792, 795 (5th Cir. 1994). Although removal of the white pines from the shelterwood harvest will increase the number of trees remaining on the Little Alfie site, the shelterwood method results in stands of trees that are essentially the same age. Before choosing to shelterwood cut, the Forest Service must find that this method is "appropriate" for achieving the objectives and requirements of the Forest Plan. 16 U.S.C. § 1604(g)(3)(F)(i).

## III. Analysis

### A. Motion for Preliminary Injunction

To obtain preliminary injunctive relief, plaintiffs must show: (1) a probability of success on the merits; (2) a threat of irreparable harm; (3) that the balance of hardships favors plaintiffs; and (4) that granting preliminary relief favors the public interest. *See Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981). The plaintiff bears the burden of proof on the four factors. *See Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

### B. Likelihood of Success

#### a. The Scope of the Court's Review of the Forest Service's Actions

Plaintiff's cause of action arises under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, which provides for judicial review of federal agency actions. The standard for judicial review of the Forest Service's decision not to conduct an EIS for a timber sale is whether the agency's action was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(a); *Goos v. Interstate Commerce Comm'n,* 911 F.2d 1283, 1291 (8th Cir.1990).[6] In order to obtain a preliminary injunction, the plaintiff must demonstrate a likelihood that it will succeed in proving that the Forest Service's decision not to conduct an EIS was arbitrary and capricious.

The Eighth Circuit has quoted with approval a list of four factors to consider in determining whether an agency's decision not to undertake an EIS is arbitrary and capricious:

(1) whether the agency took a 'hard look' at the problem;

(2) whether the agency identified the relevant areas of environmental concern;

(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

(4) if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Audubon Soc'y of Cent. Arkansas v. Dailey,* 977 F.2d 428, 434 (8th Cir.1992) (citing *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 681–82 (D.C.Cir.1982)). The court's role is not limited to determining whether the agency considered the relevant factors in making its decision; rather, the court must determine whether the agency has made a clear error in judgment. *Dailey,* 977 F.2d at 434. The Court "has the responsibility to verify that the agency's conclusion follows from the premises the agency relies on." *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).[7]

---

**6.** The Forest Service cites *Missouri Coalition for the Env't v. Corps. of Engineers,* 866 F.2d 1025 (8th Cir.1985) for the Eighth Circuit's standard for review of an agency's determination of whether an EIS is necessary under NEPA. Under *Missouri Coalition,* the Court inquires first whether the agency omitted facts from the administrative record which, if true, would show the project could have a substantial impact on the environment, and if so, the burden shifts to the agency to demonstrate the reasonableness of its decision.

After the Eighth Circuit decided *Missouri Coalition,* however, the Supreme Court held that an arbitrary and capricious standard of review applies to these decisions. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In *Goos,* 911 F.2d 1283 at 1291, the Eighth Circuit held that the reasonableness standard it applied in *Missouri Coalition* was incorrect as applied to an agency's decision that an EIS is not necessary, but noted the Supreme Court's observation that the difference between an arbitrary and capri-

cious and a reasonableness standard "is not of great pragmatic consequence." *But see Nat'l Audubon Soc'y v. United States Forest Serv.,* 46 F.3d 1437, 1445 (9th Cir.1993) (noting that "reasonableness" and "arbitrary and capricious" standards are not functionally equivalent, and that arbitrary and capricious is less rigorous standard).

**7.** According to the Forest Service, NEPA requirements are entirely procedural and a reviewing court's only role is to ascertain whether it followed proper procedural steps in making its decision. It argues that plaintiff must demonstrate the agency failed to consider material facts to support a NEPA claim. The Eighth Circuit has held that although its holding in *Missouri Coalition* may have appeared to require proof of facts the agency failed to consider, the omission of facts from the agency's record is not "the only sort of error justifying reversal of an agency." *See Dailey,* 977 F.2d at 434.

The focal point for review of the Forest Service's decision consists of the EA and the record compiled during the agency appeal process. Generally, a court reviewing an agency decision is confined to review of the administrative record compiled by the agency when it made the challenged decision. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). In NEPA cases, however, courts have found it necessary to review material outside the administrative record to properly assess the agency's decisionmaking. For example, the Eighth Circuit has held that it is not error for a district court to allow "testimony of an explanatory nature" to "sort out and wade through the voluminous administrative record," in a NEPA case, as long as the court did not create a new record on which to base its findings. *Missouri Coalition*, 866 F.2d at 1031; *see also County of Suffolk v. Sec'y of the Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977); Susannah T. French, Judicial Review of the Administrative Record in NEPA Litigation, 81 *Calif. L.Rev.* 929, 945–955 (1993). In deference to the traditional rule, the Court will initially confine its review to the administrative record. Following this review, the Court will examine whether any of the exceptions courts have recognized to justify expanding the record for review beyond the administrative record in NEPA cases apply to plaintiff's claims.

**b. The Forest Service's Determination that an Environmental Impact Statement Is Not Required.**

■ After careful review of the five-volume administrative record compiled by the Forest Service, the Court concludes that plaintiff has not demonstrated a likelihood of success in proving that the Forest Service's decision was arbitrary and capricious. The administrative record of the Forest Service's decisionmaking process is voluminous. The process involved consultation with over 20 experts in various fields. The final EA demonstrates that the interdisciplinary team conducting the Environmental Assessment considered each of the concerns and values plaintiff raises before the Court, as well as many others, in a comprehensive and thorough manner.

Plaintiff's primary objection to the Forest Service's decision that the sale would not involve significant impact on the human environment is based on the claim that the trees are "old growth" and "near-old growth" stands with great value to the public at large. The Forest Service acknowledges that the Little Alfie site contains red pines with an average age of 110 years that will be cut, that its selected alternative "will not preserve the existing old growth characteristics of the three units" to be cut, and that it will take 70 years for the trees to regenerate sufficiently to regain their existing old-growth characteristics. The Team determined, however, that the trees in these units were unlikely to be categorized as "old growth" in the future. The Little Alfie site ranked poorly on a scale of indicators for old growth status, which is a term of art, rather than a simple measure of years of age or origin of the trees.[8] The Forest Service also noted the existence of sufficient other areas within the forest with superior old growth characteristics.

The evidence in the administrative record demonstrates that the Forest Service "took a hard look" at the issue of the old growth status of trees planned for harvest on the Little Alfie site. The agency properly identified preservation of old-growth forests as a relevant area of environmental concern, among many other areas, and devoted a substantial section in its EA to its analysis of the issue. With respect to whether the agency made a convincing case that the impact was insignificant, the Court concludes that plaintiff has not provided information which would support a conclusion that the Forest Service made a clear error in judgment. Plaintiff would clearly make a different decision, but has not shown that the Forest Service's conclusion does not flow from its premises. The

---

8. The indicators considered were: the age of the trees; the trees' small size (an average of 14″ in diameter) and the fact that they are largely surrounded by harvested stands; the presence of cut stumps due to a previous thinning of the stands; the fact that two of the three stands are bisected by roads; the lack of abundant coarse woody debris; and the presence of significant white pine regeneration in the stands. The last factor was assessed positively, which led to the decision to exclude white pine from the proposed harvest.

Forest Service did take into account the public's objections to cutting white pine, and reserved all white pine from harvest. Thus, to the extent the environmental impact of this cutting of the white pines was of true significance, the changes implemented by the Forest Service at the Little Alfie Project Area have eliminated that impact. Plaintiff has not provided any evidence to demonstrate that the Forest Service's assessment of the significance and relative value of the old growth status of the Little Alfie red pines is faulty. As to plaintiff's primary objection, the Forest Service's decision was not arbitrary and capricious.

### c. Evidence of Bad Faith

Rather than providing the Court with a specific scientific or economic critique of the Forest Service's findings or decision, plaintiff changes the subject and attempts to question the integrity of the agency's process by providing the Court with evidence that some Forest Service employees questioned the appropriateness of the Little Alfie timber sale prior to the EA process. Plaintiff points to internal Forest Service documents in which Forest Service employees indicate that the decision to harvest in the Little Alfie Project Area was driven by timber targets and was not advisable from a silvicultural standpoint. Plaintiff argues that these documents create a material fact dispute as to whether the Forest Service has acted in bad faith. Plaintiff also alleges that the EA process was further tainted by the existence of a contractual obligation to Cusson Camp at the time the EA process began, and that as a result the outcome of the EA process was predetermined.

Plaintiff's arguments are based on materials outside the administrative record; and as a result, the Court must initially determine whether to consider such evidence. Plaintiff argues that these internal memoranda so strongly suggest bad faith that the Court should allow plaintiff to conduct discovery to augment the administrative record. Plaintiff requests that the Court consider these documents and allow plaintiff to conduct additional discovery of Forest Service documents and personnel.

Several courts have recognized that when plaintiffs make a showing of bad faith, the district court may inquire outside the record. See Hoffman, 132 F.3d 7, 14 ("bad faith or improper behavior on the part of the agency decisionmakers"); Nat'l Audubon Soc'y v. United States Forest Serv., 46 F.3d at 1447 n. 9 ("agency bad faith"). In Hoffman, the plaintiff produced an affidavit from a Forest Service employee alleging that the agency had already decided to issue a "finding of no significant impact" prior to completing the EA, and that the agency taught its employees to circumvent NEPA by tailoring documents to support the predetermined result. The agency responded with an affidavit stating that the employee had misunderstood the training. The Second Circuit held plaintiff's evidence was an insufficient showing of bad faith to justify consideration of materials outside the administrative record. Hoffman, 132 F.3d 7, 9.

The evidence of alleged bad faith produced by plaintiff in this case is not nearly as strong as the evidence produced in Hoffman, evidence which the Second Circuit found insufficient to justify a review beyond the administrative record. On balance, the Court believes it is inappropriate to consider the documents offered outside the administrative record in this case. Even if the Court considered this evidence, however, it would not demonstrate a likelihood of success in proving the EA was inadequate. Far from demonstrating bad faith, the internal memoranda show an agency that encourages debate and carefully reviews questions raised by employees who might disagree with proposed actions. The questions raised in the internal memoranda were explored thoroughly in the EA process and the agency's good faith is further demonstrated by the fact that the agency named one of the employees who questioned the sale to the team that conducted the EA. The documents on which plaintiff relies predate the EA process and plaintiff has produced no evidence that these individuals continued to question the sale either during the EA process or after it concluded. The documents do not call into question the process itself or the resulting finding of no significant impact.

### d. Other Challenges to the EA

The Court's review of the EA has raised additional questions about its adequacy which, although not raised by plaintiff, the Court has considered. A valid criticism of the EA is the quality of the information upon which the agency based its decision. The EA is a site-specific evaluation of a proposed sale that is based on the 1986 Forest Plan and EIS which, according to the EA, the Forest Service is in the process of revising. The information underlying the EIS and the requirements and objectives of the Forest Plan are therefore dated. In addition, in several sections of the EA, the Forest Service states that it has insufficient information to answer questions raised.[9]

Perhaps most important among these admissions is the fact that the Forest Service is "currently conducting an inventory of potential old-growth red and white pine [which] would be used during the Forest Plan revision process to help rank potential old growth and future old growth stands" and that it has only analyzed 10% of the pine stands in the future old growth category. The low scores noted in the EA for the Little Alfie Project Area are scores that would be given "*if* these 110–year old stands had been included in the 120+ year old inventory." There is no indication to what extent the low scores were affected by the category in which the stands were hypothetically evaluated, and to what extent the scores would have been better had the stands aged another 10 years. Nor is there any explanation for why the Little Alfie harvest decision is being made prior to completion of this inventory.

Upon review of cases in which courts have considered similar issues, however, the Court has concluded that these weaknesses are an insufficient basis for finding that the EA is inadequate or that the finding of no significant impact is arbitrary and capricious. In *Sierra Club v. Espy,* 38 F.3d 792 (5th Cir. 1994), the Court considered a challenge to an EA based on a Forest Plan which it had determined to be inadequate and remanded to the Forest Service for reanalysis. Nevertheless, the Court found that the objectives and requirements of the Forest Plan and its EIS were still relevant and remained controlling on site-specific decisions during the reanalysis process. *See id.* at 797, 803. In *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521 (9th Cir.1997), the Court reviewed a Forest Plan and EIS which was based explicitly on an outdated inventory. The plaintiff challenged an EA and finding of no significant impact for a site-specific sale on the grounds that it was based on the outdated information about the actual location of existing old growth in the Forest Plan and EIS. *Id.* at 528. The Court found that leaving the designation of old growth stands in the Forest Plan to the implementation stage was not arbitrary and capricious, as long as each timber sale was evaluated to ensure it would not undermine the Forest Plan requirements. *Id.* at 529–30.

Any inadequacies of information on old-growth status and distribution in the instant case are of significantly less import than those raised in *Hoffman* and *Lowe.* Based on those decisions, the Court concludes that the lack of information noted in the Little Alfie EA is an insufficient basis for finding the Little Alfie EA inadequate and the decision arbitrary and capricious.

Another potential inadequacy of the Little Alfie EA is that the agency concluded that there is "no known documentation of the value of ... non-market commodities" such as the economic value of recreational use of older forest settings, and appears to have assigned little value to such considerations in assessing environmental impact. One of the purposes of NEPA, which took effect over 25

---

9. For example: the "appropriate distribution of [red and white pine acres 70+ years old] is not certain and still needs to be addressed" (EA at 3–7); "the Forest Plan does not require or define old growth forests as they are now defined" (EA at 3–7); the "overall importance of the mature red and white pine stands that remain on the Forest cannot be fully assessed until a complete inventory is conducted" (EA at 3–17); "It is difficult, if not impossible, to determine the economic effects ... recreation would provide to the local or regional economy." (EA at 4–4); "The amount of infestation at any level of crown closure would not be able to be accurately predicted." (EA at 4–7); "the impacts of past harvesting in the area on soil productivity has not been assessed" (EA at 4–19).

years ago, was to "identify and develop methods and procedures ... which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332 (2)(B). While there is no clear substantive mandate requiring the agency to assign an economic value to the public's interest in "aesthetic and environmental well-being," there is little efficacy in recognizing plaintiff's standing to complain of injury to such interests without substantive standards protecting them. This is an issue of public policy, however, which appears to lie within the prerogative of the Congress. In the area of forest management, Congress has clearly indicated that its policy favors timber harvest, and the Little Alfie EA is consistent with Congress' direction to the Forest Service in the National Forest Management Act and the Multiple–Use Sustained Yield Act of 1960.

### e. Plaintiff's Challenge to the Forest Service's Contract with Cusson Camp

Plaintiff argues that because the Forest Service contracted with Cusson Camp for the sale of the Little Alfie timber prior to conducting an EA, the sale contract is invalid or illegal and must be enjoined. Plaintiff has not demonstrated a likelihood of success on the merits of this claim. The Forest Service did enter into the contract with Cusson Camp prior to engaging in the EA process, but it corrected that decision by putting the contract on hold pending completion of the EA process. If plaintiff could demonstrate that the premature commitment to the contract substantively affected the outcome of the EA process, such evidence would be relevant to the Court's review of the Forest Service's decision not to undertake an EIS. Plaintiff, however, has identified nothing which makes entering into a contract with Cusson Camp prior to conducting an EA per se illegal. Furthermore, defendant has shown that plaintiff's view of the facts is inconsistent with the documentation—the Forest Service did modify the contract after the EA process to exclude white pines that were previously included in the sale.

For the foregoing reasons, the Court concludes that plaintiff has failed to demonstrate a likelihood of success on the merits. Without this showing, plaintiff fails to satisfy the first prong of the *Dataphase* test.

### C. Irreparable Harm

To satisfy the second prong of the *Dataphase* test, plaintiff must demonstrate that it will suffer irreparable harm in the absence of a preliminary injunction. Plaintiff has made a clear showing of irreparable harm. The red pine trees in the Little Alfie Project Area are, on average, 110 years old. The decision to harvest them, once implemented, is irreversible.

### D. Balance of the Harms

The Court must balance the hardships to plaintiff and defendants in determining whether to grant plaintiff preliminary relief. Defendant Cusson Camp alleges that it will suffer irreparable injury if a preliminary injunction is granted because it is losing profits on the timber harvest at a rate of $6,000 per day, and that these lost profits will soon result in layoffs and irreparable harm to individual employees and the local economy. While these harms are significant, particularly to Cusson's employees, the irreparability of a timber harvest clearly favors plaintiff.

### E. Public Interest

Plaintiff argues that the public interest in preserving old growth forests outweighs any private interest in the profits for which Cusson Camp bargained, and for which it may seek recovery by enforcing its contract. While the Court does not minimize the public interest in mature forest areas, which certainly is high, Congress has clearly acted to determine the public policy of the United States with respect to forest areas. The Forest Service's decisions implement the public interest as determined by the elected officials who set public policy. The public interest in proper forest management in the Superior National Forest is consistent with the mandates of the NFMA, which requires management for multiple uses including timber harvesting and forest regeneration. While there may be competing public inter-

ests at stake here, the public interest relevant in this forum is in ensuring that the Forest Service has carefully complied with Congress' directives.

In view of the plaintiff's failure to demonstrate a likelihood of success on the merits of its challenge, the *Dataphase* factors do not support a grant of preliminary relief. The Court will therefore deny plaintiff's motion for a preliminary injunction.

### F. Defendants' Motions for Summary Judgment

■ Plaintiff argues in response to defendants' summary judgment motions that it is entitled to discovery before the Court considers these motions. Plaintiff fails to recognize, however, the effect the posture of this case has on its right to discovery. The Court is presented with a challenge to an administrative agency's decision. With certain narrow exceptions, the Court's review is confined to the administrative record. In fact, the Court has carefully examined possible avenues to review of evidence outside the record, and found none. Plaintiff certainly has not demonstrated any valid need for discovery beyond the administrative record submitted to the Court. Nor has plaintiff sought a delay in the Court's consideration of the summary judgment motions pursuant to Fed.R.Civ.P. 56(f), the proper vehicle for such a request. Rule 56(f) requires that the party opposing summary judgment file an affidavit explaining why discovery is needed. *See Carman v. McDonnell Douglas Corp.,* 114 F.3d 790 (8th Cir.1997) (no abuse of discretion where district court held that failure to file affidavit explaining why more discovery was needed defeated argument that summary judgment was premature); *United States v. Birchem,* 100 F.3d 607 (8th Cir. 1996) (summary judgment was not premature where opposing party did not ask for delayed ruling nor file an affidavit pursuant to Rule 56(f)).

Plaintiff has made only vague references to a need to inquire into prior Forest Service activities on the Little Alfie site. Plaintiff argues, for example, that review of documents associated with a 1983 thinning of the stands at issue may create a genuine issue of material fact in dispute. The Forest Service has demonstrated that plaintiff's argument with respect to the 1983 thinning lacks merit and any such documents would not be relevant to the issue before the Court. To the extent that plaintiff suggests the need to inquire into the decisionmaking process of agency officials, such discovery would be inappropriate. There is no lack of documentation of the process and the decisionmaker's reasoning in this case; nor is there a strong indication of bad faith, as discussed above. Under these circumstances, the Court would not permit discovery of the mental processes of the decisionmakers.

For the reasons stated in the Court's analysis of plaintiff's likelihood of success on the merits, and based on the procedural posture of this case and the scope of the record for judicial review, the Court concludes that there is no genuine issue of material fact in dispute and that defendants are entitled to judgment as a matter of law. *See Sierra Club v. Espy,* 38 F.3d at 797 (denying preliminary injunction and granting summary judgment for defendants in challenge to Forest Service action under NEPA and NFMA).

## IV. Conclusion

This case has been described to the Court as the newest arena in which those who would protect old-growth mature forests for the future are doing battle with those whose livelihood depends on the jobs created by the important timber industry. While this larger dispute is genuine and often difficult, this case presents few of the issues involved in the simmering national debate over the future of the national forests. While the Court remains concerned by timber sales based upon sometimes inadequate information in an outdated Forest Plan and EIS, there is nothing in the record of this case to suggest that the Forest Service decision to harvest the red pines at Little Alfie was arbitrary or capricious. Plaintiff must do more than raise the question, and that is all it has done in this case.

In essence, the plaintiff's dispute is with the Congressional policy favoring timber harvest. Perhaps a time will come when there is a more balanced approach to documenting

the values of each of the many competing interests in the national forests. There is value in recreational use of mature forests, just as there is value in timber harvest in these forest areas. Current policy does not appear to fully recognize all of the competing interests. This contest may yet be engaged in the forests of northeastern Minnesota, but in the view of the Court, this is not the case or the site.

### ORDER

Based on the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED that:**

1. Plaintiff's motion for a preliminary injunction [Docket No. 2] is **DENIED.**

2. The Forest Service defendants' motion for summary judgment [Docket No. 17] is **GRANTED.**

3. Defendant Cusson Camp Company's motion for summary judgment [Docket No. 22] is **GRANTED.**

4. This Order is stayed until 4:00 p.m. on Tuesday, February 10, 1998. Until that date, the Temporary Restraining Order preserving the status quo granted at the Court's hearing on January 21, 1998, shall remain in effect.