**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1852

_____

Newton County Wildlife Association,    *
et al.,                                    *
                                           *

      Plaintiffs - Appellants,      *
                                           *

      v.                                 *   Appeal from the United States
                                           *   District Court for the
George Rogers, et al.               *   Eastern District of Arkansas.
                                           *

      Defendants - Appellees,       *
                                           *

Arkansas Forestry Association, et al.,                           *
                                           *

      Intervenors - Appellees.      *

_____

Submitted:   December 10, 1997
                           Filed:   April 1, 1998

_____

Before FAGG, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

     Newton County Wildlife Association, the Sierra Club, and certain individuals (collectively "the Wildlife Association") sued the United States Forest Service and four of its employees (collectively the "Forest Service") to enjoin or set aside four timber

sales in the Ozark National Forest. The district court[1] denied a preliminarily injunction under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271, *et seq.*, or the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 *et seq.*, and we affirmed. <u>Newton County Wildlife Ass'n v. United States Forest Service</u>, 113 F.3d 110 (8th Cir. 1997), <u>cert. denied</u>, 1998 WL 69365 (Feb. 23, 1998). The Wildlife Association now appeals the district court's decision to limit its review to the administrative record, <u>Newton County Wildlife Ass'n v. Rogers</u>, 948 F. Supp. 50 (E.D.Ark. 1996), and its subsequent grant of summary judgment in favor of the Forest Service. We affirm.

## I. Background.

The Forest Service manages the national forests for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The National Forest Management Act, 16 U.S.C. §§ 1600, *et seq.* ("NFMA"), requires the Forest Service to develop Land and Resource Management Plans ("Forest Plans") for the management of national forests. <u>See</u> 16 U.S.C. § 1604. Individual projects, including timber sales, are assessed in light of the Forest Plan. <u>See</u> 16 U.S.C. § 1604(i); <u>Sierra Club v. Robertson</u>, 28 F.3d 753, 755 (8th Cir. 1994). The Forest Service issued a ten-year Forest Plan for the 1,118,500-acre Ozark National Forest in 1986. The Plan was accompanied by an Environmental Impact Statement ("EIS") analyzing the environmental consequences of timber sales, including the impact of harvesting and road construction on water quality, wildlife and fish, wilderness areas, and threatened, endangered, and sensitive wildlife and plant species.

In the early 1990's, the Forest Service proposed four timber sales in "general" areas of the Buffalo Ranger District (areas administered under the Plan to yield a high level of timber). The proposed sales -- Sand Gap, Round Hill, Junction, and Sandy

---

[1]The HONORABLE WILLIAM R. WILSON, JR., United States District Judge for the Eastern District of Arkansas.

Springs -- involve timber harvesting on a total of 3,011 acres of forest and require 13.64 miles of logging road reconstruction and 5.08 miles of new road. For each proposed sale, the Forest Service mailed notices to affected and interested members of the public, including the Wildlife Association, describing the proposal and soliciting comments. After receiving responses, the Forest Service studied site-specific environmental effects and developed Environmental Assessments ("EAs") evaluating the environmental impacts of various sale alternatives, including the "no action" alternative. Biological evaluations were prepared analyzing likely effects on species known to inhabit the Forest. The District Ranger circulated the EAs with requests for public comment prior to issuing Decision Notices.

The Forest Service issued Decision Notices for Sand Gap and Round Hill on May 27, 1994. Administrative appeals were rejected by September 1994, and the sales took place that fall. Purchasers commenced road construction and logging in the spring of 1995. The Forest Service issued Decision Notices for Junction and Sandy Springs on June 19 and May 22, 1995, and rejected administrative appeals in the fall of 1995. The Wildlife Association filed this lawsuit on December 20, 1995. The second amended complaint alleges that plaintiffs "seek judicial review of final agency action in approving" the four timber sales. Counsel for the Forest Service advised at oral argument that approximately three-fourths of road work and timber harvesting in the four sale areas is now completed.

The Forest Service approved the timber sales acting under NFMA. That Act "provides the mechanism for obtaining judicial review." See <u>Defenders of Wildlife v. Administrator, E.P.A.</u>, 882 F.2d 1294, 1303 (8th Cir. 1989). Though the Wildlife Association argues that the timber sales violate no less than six substantive federal statutes, it persistently fails to relate those arguments to the standard for judicial review set forth in the Administrative Procedure Act, which provides that this type of final agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See <u>Citizens to Preserve Overton Park, Inc.,</u>

v. Volpe, 401 U.S. 402, 414-15 (1971); 5 U.S.C. § 706(2)(A).  Thus, we deal here primarily with a single cause of action for APA review -- not, as the Wildlife Association pleaded, with multiple statutory claims for relief.

## II.  The Record on Review.

APA review of agency action is normally confined to the agency's administrative record.  See Camp v. Pitts, 411 U.S. 138, 142 (1973).  If the agency record is for some reason inadequate, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation."  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).  When as here there is a contemporaneous administrative record and no need for additional explanation of the agency decision, "there must be a strong showing of bad faith or improper behavior" before the reviewing court may permit discovery and evidentiary supplementation of the administrative record.  Overton Park, 401 U.S. at 420; see Cronin v. United States Dep't of Agric., 919 F.2d 439, 444 (7th Cir. 1990); Maxey v. Kadrovach, 890 F.2d 73, 77 (8th Cir. 1989), cert. denied, 495 U.S. 933 (1990).

We conclude the district court did not abuse its discretion by conducting its judicial review on the voluminous administrative record compiled by the Forest Service for the four timber sales.  See Missouri Coalition for the Env't v. Corps of Engineers, 866 F.2d 1025, 1031 (8th Cir.) (standard of review), cert. denied, 493 U.S. 820 (1989).  The court properly excluded the Wildlife Association's voluminous evidence concerning post-sale logging and road construction because its lawsuit challenges the Forest Service's timber sales decisions, not post-sale activities implementing the sales.  On appeal, the Wildlife Association argues this evidence should be admitted by the reviewing court under the bad faith exception to record review because of the discrepancy between the actual logging and road construction taking place, and the environmentally less damaging activity studied in the pre-sale Environmental Assessments (an asserted discrepancy the agency emphatically denies).  Like the

-4-

district court, we find this threshold showing of bad faith woefully inadequate to justify going outside the administrative record.

The Wildlife Association further argues that it must be allowed to go outside the agency record to demonstrate that the Forest Service violated its duty under the National Environmental Policy Act ("NEPA") to consider all relevant environmental factors. See 42 U.S.C. § 4332. We need not decide whether to adopt the Second Circuit's view that courts should be more willing to go outside the administrative record in considering NEPA challenges. See National Audubon Soc'y v. Hoffman, 132 F.3d 7, 14-16 (2d Cir. 1997); County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1384-85 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978). Here, the Wildlife Association wishes to supplement the record with evidence of post-sale implementation activity, information that was not available to the Forest Service when it prepared the Environmental Assessments. As we said in Lockhart v. Kenops, 927 F.2d 1028, 1036 (8th Cir.), cert. denied, 502 U.S. 863 (1991):

> This court's task is to make sure the Forest Service considered the information available at the time it made its decision; if the agency's decision was proper at the time it was made, our inquiry is at an end.

Accord Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58, 63-64 (4th Cir. 1991), cert. denied, 502 U.S. 1092 (1992). To the extent the Wildlife Association's extra-record proffers consisted of expert opinions and studies analyzing environmental impacts and conditions known prior to the sales, the Association failed to provide adequate justification for its failure to present those materials to the agency during its decision-making process. See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553-54 (1978).

Finally, the Wildlife Association argues that it should be entitled to go outside the administrative record because it has invoked the citizen-suit provisions of the

Endangered Species Act, 16 U.S.C. § 1540(g)(1) ("ESA"), and the Clean Water Act, 33 U.S.C. § 1365(a)(1). We disagree. These statutes provide for judicial review but do not prescribe a standard for that review. "[W]here Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held." United States v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963); see Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 685-86 (D.C. Cir. 1982).

### III.  The Merits.

A. Wild & Scenic Rivers Act.  WSRA requires federal agencies responsible for land adjacent to designated river components to protect designated rivers, with "[p]articular attention" paid to "scheduled timber harvesting, road construction, and similar activities which might be contrary to the purposes of this chapter." 16 U.S.C. § 1283(a). In our prior opinion, we noted that "the Forest Service may well have WSRA compliance obligations in approving timber sales (an issue not before us)." 113 F.3d at 112-113. On this appeal, the Wildlife Association argues that the timber sales violate the Forest Service's WSRA duties to protect the water quality of designated segments of the Buffalo River and Richland Creek, and to "cooperate with the Secretary of the Interior and with the appropriate State water pollution control agencies for the purpose of eliminating or diminishing the pollution of waters of the river." 16 U.S.C. § 1283(c).

The Wildlife Association points to nothing in the administrative record establishing that the Forest Service acted arbitrarily and capriciously in finding that logging and road work will have an insignificant effect on WSRA-designated river components. The EAs thoroughly discuss the impact of the sales on water quality of the Buffalo River and Richland Creek and call for mitigation measures designed to protect affected waters. We reject the Wildlife Association's contention that the Forest

Service failed to cooperate with state water pollution control agencies simply because the Arkansas Department of Pollution Control and Ecology and the Arkansas Natural and Scenic Rivers Commission opposed the sales. The record reflects that the Forest Service considered the State's objections even though they were not expressed until after the comment period ended.

B. National Forest Management Act. The Wildlife Association argues that the timber sales are inconsistent with 1991 amendments to the Forest Plan and EIS for the Ozark National Forest because the Forest Service (1) failed to timely make available an inventory map of all forest roads with their management objectives; (2) failed to designate "Special Interest" areas; (3) increased net logging road mileage within the Forest; and (4) authorized road construction and logging within 198 feet of the Highlands Trail. None of these relatively insignificant issues comes close to establishing that approval of the sales was arbitrary or capricious. For example, the Forest Service explains that the Forest Plan's requirement of no net increase in logging roads is a forest-wide concept, and the four sales in question involve less than ten miles of new road and reconstruction of less than twenty miles of road.

C. National Environmental Policy Act. NEPA requires all federal agencies, including the Forest Service, to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Council on Environmental Quality regulations provide that an agency may prepare an EA to determine whether an action significantly affects the environment. If the agency determines based upon the EA not to prepare an EIS, it makes and publishes a finding of no significant impact, or "FONSI." See 40 C.F.R. § 1501.4. An EA is a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement . . . is necessary." Cronin, 919 F.2d at 443. If an agency has prepared an EIS for a large action, the regulations encourage it to incorporate EIS conclusions into EAs prepared for smaller, subsequent actions included within the broad program. See 40 C.F.R. § 1502.20.

In this case, the Forest Service prepared an EIS for the broad Forest Plan and EAs for the four timber sales. The Wildlife Association argues that the Forest Service violated NEPA by not preparing an EIS for the timber sales. It further contends that the four EAs failed to analyze the cumulative effects of the sales on watershed resources, fish, and wildlife. We "must affirm if we find the Service took a 'hard look' at the project, identified the relevant areas of environmental concern, and made a convincing statement for its FONSI." Sierra Club v. United States Forest Service, 46 F.3d 835, 838-39 (8th Cir. 1995).

The Forest Plan EIS considered cumulative impacts and forest management issues for the Ozark National Forest as a whole. Each timber sale EA is over one hundred pages long and is "tiered" to the Forest Plan EIS, consistent with the policy behind 40 C.F.R. § 1502.20 to save money and time by avoiding repetitive inquiries. While the EAs do not cross reference each other, each expressly addresses cumulative environment impacts. The EAs study areas significantly larger than the area to be logged; for example, the Sandy Springs sale involves 1,871 acres, but its EA considers environmental impacts on 26,699 acres. An "EA cannot be both concise and brief and provide detailed answers for every question." Sierra Club, 46 F.3d at 840. Recognizing that federal agencies must study cumulative environmental impacts and prepare comprehensive EIS's when appropriate, we conclude the Forest Service's EAs were not arbitrary or capricious compliance with its NEPA obligations in making these timber sale decisions. See Kleppe v. Sierra Club, 427 U.S. 390, 410-14 (1976).

D. Clean Water Act. The Wildlife Association argues the Forest Service failed to obtain necessary NPDES and dredge and fill permits for the discharges of pollutants that will accompany logging and road construction under the timber sales. See 33 U.S.C. §§ 1311(a), 1344. These contentions are without merit. The Wildlife Association cites no authority for the proposition that the Forest Service needs an NPDES permit before contracting to allow others to harvest timber and build roads. The Environmental Protection Agency, which administers the NPDES permit program,

has not intervened to support this contention, and EPA's regulations expressly provide, "it is the operator's duty to obtain a permit." 40 C.F.R. § 122.21(b). Moreover, EPA regulations do not include the logging and road building activities cited by the Wildlife Association in the narrow list of silvicultural activities that are point sources requiring NPDES permits. See 33 U.S.C. §§ 1311(a), 1342(a), 1362(12), (14); 40 C.F.R. § 122.27(b)(1); 41 Fed. Reg. 24709, 24710 (June 18, 1976). Similarly, logging and associated road building are exempt from dredge and fill permit requirements so long as construction and maintenance comply with best management practices. See 33 U.S.C. §§ 1344(f)(1)(A); 1344(f)(1)(E). The administrative record contains no evidence those practices have not been followed.

The Wildlife Association next argues that the timber sales are contrary to the State of Arkansas antidegradation policy and therefore violate the Clean Water Act. See 33 U.S.C. § 1323(a). Assuming without deciding that compliance with a state antidegradation policy is a legitimate inquiry on APA review of this type of agency action, we conclude the Arkansas statewide policy for nonpoint sources is so broadly stated that the Forest Service was not arbitrary or capricious in concluding this policy added nothing to its compliance obligations under federal environmental laws.

E. Wilderness Act. The Wilderness Act of 1964 makes agencies that administer wilderness areas responsible for preserving their wilderness character. See 16 U.S.C. § 1133(b). The Arkansas Wilderness Act of 1984 designated parts of the Ozark National Forest as wilderness areas. See Pub. L. No. 98-508, 98 Stat. 2349 (1984). Although the four timber sales are not located within wilderness areas, the Wildlife Association argues that the sales violate the Wilderness Act because the logging activities are upstream and will degrade the quality of Buffalo River and Richland Creek waters flowing through designated wilderness areas.

The district court rejected this argument based upon Section 7 of the Arkansas Wilderness Act, which disclaims any congressional intent to create "protective

perimeters or buffer zones around each wilderness area." 98 Stat. at 2352. We agree. If the Forest Service prohibited an activity outside a wilderness area "solely because of its potential effect on the Wilderness area," that prohibition would violate Section 7. Northwest Motorcycle Ass'n v. United States Dep't of Agric., 18 F.3d 1468, 1480 (9th Cir. 1994). Moreover, the Forest Service thoroughly considered the effect of logging and road construction on the water quality of the Buffalo River and its tributaries, including Richland Creek, concluding that with mitigation measures and best management practices the impact on water quality would be insignificant. The Wildlife Association points to nothing in the administrative record establishing that this analysis was arbitrary or capricious.

F. Endangered Species Act. The Endangered Species Act requires federal agencies to consult with the appropriate federal fish and wildlife agency when their actions "may affect" an endangered or threatened species. See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The Wildlife Association argues the Forest Service was arbitrary and capricious in approving the sales before the United States Fish and Wildlife Service determined whether the logging might significantly affect any listed species. The Forest Service prepared a detailed biological "evaluation" for each sale and found there was no effect on any listed or endangered species. A finding of no effect obviates the need for consultation with the Fish and Wildlife Service. See 50 C.F.R. § 402.14; Southwest Center for Biological Diversity v. United States Forest Service, 100 F.3d 1443, 1447 (9th Cir. 1996). The Wildlife Association argues the Forest Service was required to prepare biological "assessments" to decide whether to consult with the Fish and Wildlife Service. See 16 U.S.C. § 1536(c). However, a biological assessment is only required for "major construction activities." 50 C.F.R. § 402.12. Finally, the Wildlife Association argues the Forest Service failed to make an adequate assessment of whether the sales would affect the bald eagle. However, the biological evaluations and the EAs specifically considered impacts on the bald eagle and its habitat and determined that the sales would have no effect. Accordingly,

nothing in the administrative record establishes that the Forest Service was arbitrary or capricious in carrying out its ESA obligations regarding these sales.

We have carefully considered all other arguments made by the Wildlife Association and conclude they are without merit. The judgment of the district court is affirmed. As the Wildlife Association is not a prevailing party, its request for an award of attorney's fees and costs on appeal is denied. See 28 U.S.C. § 2412.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.