**Na Mamo O 'AHA'INO, a Hawaii unincorporated association, Plaintiff,**

v.

**Gary O. GALIHER, an individual, and Diane T. Ono, an individual, Defendants.**

No. 97–01073 DAE.

United States District Court, D. Hawai'i.

Nov. 25, 1998.

---

David L. Henkin, Sierra Club Legal Defense Fund, Inc., Honolulu, HI, for Na Mamo O 'Aha'ino, plaintiff.

Lisa W. Munger, Goodsill Anderson Quinn & Stifel, Honolulu, HI, Edmund Burke, Burke Sakai McPheeters Bordner, Iwanaga & Estes, Honolulu, HI, Wesley H.H. Ching, Robert R. Sadaoka, Fukunaga Matayoshi Hershey & Ching, Honolulu, HI, for Gary O. Galiher, Diane T. Ono, defendants.

*ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

DAVID ALAN EZRA, District Judge.

The court heard Plaintiff's and Defendants' Motions on November 19, 1998. David L.

Henkin, Esq., appeared at the hearing on behalf of Plaintiff; Wesley H.H. Ching, Esq., appeared at the hearing on behalf of Defendants. After reviewing the motions and the supporting and opposing memoranda, the court DENIES Plaintiff's Motion for Partial Summary Judgment and GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

## BACKGROUND

Plaintiff Na Mamo O 'Aha'ino ("Plaintiff") filed this action against Defendants Gary O. Galiher and Diane T. Ono (collectively "Defendants") based on alleged violations of the Clean Water Act ("CWA") and its implementing regulations. Specifically, Plaintiff contends that various "construction" activities on Defendants' Molokai property triggered the need for a National Pollutant Discharge Elimination System ("NPDES") permit. The first two counts of Plaintiff's Second Amended Complaint are based on Defendants' failure to obtain a required NPDES permit and subsequent unpermitted discharges. The third count maintains that Defendants failed to obtain a dredge and fill permit prior to filling a portion of 'Aha'ino stream.

The "construction" activities at issue in this case include building a helipad and utility barn; creating terraces; erecting water tanks for irrigation; stockpiling road building material; filling wetlands; clearing a turnaround area; and constructing, using, and maintaining access roads.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Courts must view the evidence and

make any inferences in the light most favorable to the party opposing summary judgment. *Diaz v. American Telephone & Telegraph,* 752 F.2d 1356, 1362 (9th Cir.1985). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: the evidence either presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Id.* (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)).

## DISCUSSION

### I. NPDES Permits

In 1972, Congress enacted the Federal Water Pollution Control Act, known as the Clean Water Act ("CWA"), in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301(a) of the CWA prohibits "the discharge of any pollutant" into the nation's waters, except when specifically authorized under the CWA. 33 U.S.C. § 1311(a). Section 402(a) autho-

rizes the issuance of National Pollution Discharge Elimination System ("NPDES") permits to particular entities, allowing discharge of limited amounts of pollutants into surface waters. 33 U.S.C. § 1342(a). Since October 1, 1992, when the NPDES permit system took effect, NPDES permits have been required for storm water discharges from "construction activity including clearing, grading, and excavation activities except: operations that result in the disturbance of less than five acres of total land area which are not part of a larger common plan of development or sale." 40 C.F.R. § 122.26(b)(14)(x).

Defendants admit that they never secured NPDES permits for any of their site work. Instead, they maintain that no permits were required. Thus, the only questions presented are whether Defendants' activities constitute "construction activities" within the meaning of 40 C.F.R. § 122.26(b)(14)(x), and if so, 1) whether the activities are part of a larger common plan and 2) whether the activities resulted in disturbance of five or more acres of land.

### I.A. "Construction Activities"

Defendants argue that their activities are non-point source "agricultural or silvicultural activities" which are not discharges regulated by the NPDES permit program. The term "point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Construction, as described in 40 C.F.R. § 122.26(b)(14)(x), is a point source activity. Non-point source pollution is not specifically defined in the CWA, but has been described by the Ninth Circuit as "any source of water pollution or pollutants not associated with a discrete conveyance." *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1424 n. 8 (9th Cir. 1989).

40 C.F.R. § 122.3(e) excludes from the permit requirement "any introduction of pollutants from non point-source agricultural and silvicultural activities, including storm water runoff from orchards, cultivated crops, pastures, range lands, and forest lands . . . ." Exempt non-point source silvicultural activities include "nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface draining, or *road construction and maintenance from which there is natural runoff.*" 40 C.F.R. § 122.27(b)(1)(emphasis added). The Environmental Protection Agency ("EPA") has stated that although storm water discharges from a construction activity require permit authorization, "the development of land for agriculture is not considered a construction project regulated by the NPDES permit program." 63 Fed.Reg. 7858, 7876 (February 17, 1998).

The court must determine whether Defendants' activities constitute "construction activities" or whether they constitute non-point source discharges and/or "development of land for agriculture."

### I. A. 1. Access Roads

While the parties disagree on the extent to which the access roads were developed prior to Defendants' purchase of the land, neither party disputes that Defendants realigned and used the access roads for farming purposes. Although the EPA has stated that "construction" *may* include road building, the court concludes that, in this case, Defendants' access roads fall within the "agricultural or silvicultural" exception for the following reasons.

First, the farming roads here are analogous to logging roads which other courts, including the Ninth Circuit, have recognized as non-point sources that are excluded from the NPDES permit process. *See, e.g., Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 844 (9th Cir.1987) (construction of logging road and bridge not point source discharges subject to regulation); *Newton County Wildlife Assoc. v. Rogers*, 141 F.3d 803 (8th Cir.1998) ("EPA regulations do not include the logging and road building activities cited by the Wildlife Association in the narrow list of silvicultural activities that are point sources requiring NPDES permits"). There is no substantial

difference between the harm caused by forest roads and that caused by Defendants' farm roads.

Second, statutory construction and consideration of the CWA as a whole support the court's conclusion. Although only silvicultural activity expressly includes "road construction and maintenance from which there is natural runoff," both agricultural *and* silvicultural activities are exempt from the permit requirement. Ordinarily, when Congress includes an exception in one definition and not another, the court would be inclined to hold that Congress did not intend to extend the exception beyond that expressly indicated. But, in this case, "agricultural" activity is not expressly defined anywhere in the CWA. Nevertheless, interpreting agricultural activity to include road construction and maintenance is consistent with other provisions of the CWA. 33 U.S.C. § 1344(f)(1)(E) excludes from the dredge and fill permit requirement, "construction or maintenance of *farm roads* or forest roads ..." (emphasis added). Clearly, Congress viewed these types of roads as similar in nature.

Third, based on the legislative history of the CWA, the court is convinced that Congress weighed the costs and benefits of excluding farm roads and forest roads from the NPDES permit requirements and concluded that no such permits were required. The Senate Report which discusses section 404 of the CWA states that "permit issuances for such activities [the construction of farm and forest roads] would delay and interfere with timely construction of access for cultivation and harvesting of crops and trees with no countervailing environmental benefit." S.Rep. No. 95–370, at 168 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326. Furthermore, the legislative history indicates that while Congress "understood that some of these activities may necessarily result in ... minor harm," it provided such permit exclusions nonetheless. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 926 (5th Cir.1983)(quoting Senator Muskie, one of the primary sponsors of the CWA).

Based on the foregoing reasons, the court finds that Congress intended to extend the exception for road construction to farm access roads. Therefore, Defendants' construction, use and maintenance of such roads did not require an NPDES permit.

### I. A. 2. Other "Construction" Activities

Regardless of whether Defendants' remaining activities, including building the helipad and utility barn, constructing terraces, installing water tanks, clearing a turn around area, stockpiling road building material, and filling wetlands constitute "construction" activities, they fall within the exception of 40 C.F.R. § 122.26(b)(14)(x) as discussed below.

### I. B. 40 C.F.R. § 122.26(b)(14)(x)

Assuming, without deciding, that Defendants' remaining activities constitute "construction" activities, Defendants still were not required to secure NPDES permits prior to undertaking these activities. 40 C.F.R. § 122.26(b)(14)(x) excludes from the NPDES permit requirement those construction activities "that result in the disturbance of less than five acres of total land area which are not part of a larger common plan of development or sale."

### I. B. 1. Disturbance of Five or More Acres

For purposes of these motions, the court adopts Plaintiff's calculations of disturbed land area. As discussed above, the court excludes those calculations regarding the farm access roads. The remaining activities do not result in the disturbance of five or more acres of land. Plaintiff's expert determined that the construction of the helipad and utility barn disturbed .79 acres; construction of terraces, .24 acres; installation of water tanks, .07 acres; clearing the turn around area, .06 acres; stockpiling road building material, .12 acres; filling wetlands to build fenceline and road, .33 acres. Thus, the total of land area disturbed by Defendants' activities is at most 1.61 acres[1], far less than the five acres which triggers the need for an NPDES permit.

---

1. Because Plaintiff's Second Amended Complaint alleges violation of the NPDES permit requirement only since December of 1994, Defendants contest the inclusion of activities that occurred prior to this date.

*I. B. 2. "Larger Common Plan of Development"*

In order to fall within the exception of 40 C.F.R. § 122.26(b)(14)(x), the disturbed acreage must be less than five acres *and* the construction must not have occurred pursuant to a "larger common plan of development." The "plan" in a common plan of development is broadly defined by the EPA as any announcement or piece of documentation or physical demarcation indicating construction activities may occur on a specific plot. The EPA further clarified what is meant by a "larger common plan of development":

> "Part of a larger common plan of development or sale" is a contiguous area where multiple separate and distinct construction activities may be taking place at different times on different schedules under one plan. Thus, if a distinct construction activity has been identified onsite by the time the [NPDES] application would be submitted, that distinct activity should be included as part of a larger plan.

NPDES Storm Water Program Question and Answer Document Volume I, March 1992, page 16. Various examples provided by the EPA include residential subdivisions, industrial parks, and shopping malls.

Because the construction, use, and maintenance of the access roads do not constitute "construction" activities, the court does not consider these in determining whether a common plan existed. Regardless, Defendants insist that they had no "larger common plan of development" and that, instead, they conceived of and initiated each activity as a separate and discrete project. Defendants maintain that they did not decide to build the helipad and utility barn until incidents of vandalism and trespassing necessitated such measures more than two years after the roads were completed. Thus, Defendants argue that they could not have applied for a permit in October of 1992, as Plaintiff alleges, nor at any other single point in time because the various activities not only occurred over the course of several years, but were also conceived of years apart.

In response, Plaintiff points to several documents which allegedly establish a "larger common plan of development." First, Plaintiff relies on a Cooperative Agreement between Defendants and the Molokai–Lanai Soil and Water Conservation District. However, the Cooperative Agreement describes only Defendants' interest in conserving the soil and water resources "on the land ... which is divided by land use as follows: 350 [acres] to be planned for orchard and grazing." No language in the document indicates that any "construction activities may occur on a specific plot."

Plaintiff also argues that the "working master plan," submitted to the County of Maui Planning Department is a "plan" sufficient to establish a "common plan of development." However, the document is dated February 15, 1995, almost two-and-a-half years after October 1, 1992, the date on which Plaintiff alleges Defendants should have obtained a permit. Further, there is no indication in the document that a "construction activity may occur on a specific plot" or that any "construction activity" will ever occur. Rather, the document discusses planting trees and raising animals.

In asserting that these documents confirm Defendants' plan to develop "every nearly every square foot at 'Aha'ino," Plaintiff confuses development with construction. Although Defendants may have intended to develop their land for agriculture and farming, there is no indication from these documents that they intended to carry out construction activities. Moreover, Plaintiff's assertion that actual construction activity confirmed the existence of a larger common plan of development begs the question.

In conclusion, the court finds that Defendants' various activities were not undertaken pursuant to a "larger common plan of development."

Therefore, because Defendants' construction, maintenance and use of farm roads are excluded by the "agricultural or silvicultural activities" exception, and because Defendants' remaining activities did not result in the disturbance of more than five acres and were not carried out pursuant to a "larger common plan of development," the court concludes that Defendants were not required to secure an NPDES permit for their activities. Thus, the court DENIES Plaintiff's Motion

for Partial Summary Judgment and GRANTS in part Defendants' Motion for Summary Judgment as to Counts 1 and 2.

## II. Dredge and Fill Permit

At the conclusion of briefing, both parties conceded that a genuine issue of material fact exists with respect to whether Defendants placed fill material in the 'Aha'ino Stream. For this reason, summary judgment is inappropriate on this count. Therefore, Defendants' Motion for Summary Judgment is DENIED in part as to Count 3.

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's Motion for Partial Summary Judgment and GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.