**ARKANSAS REGIONAL ORGAN RECOVERY AGENCY, INC., Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

No. 4:00CV00246GH.

United States District Court, E.D. Arkansas, Western Division.

July 6, 2000.

William A. Waddell, Jr., Lynda M. Johnson, Bruce B. Tidwell, Friday, Eldredge & Clark, Little Rock, AR, for plaintiff.

Paula Casey, United States Attorney, by Richard M. Pence, Jr., Assistant U.S. Attorney, Eastern Dist. of Ark., Little Rock, AR, Glen Staszewski, U.S. Department of Justice, Civil Division, Washington, D.C., Shelia M. Lieber, U.S. Department of Justice, Civil Division, Washington, D.C., for defendant.

## ORDER

GEORGE HOWARD, Jr., District Judge.

On April 6th, plaintiff, the organ procurement organization (OPO) for most of Arkansas, filed a verified complaint and petition for preliminary injunction seeking to have certain Final Rule and Performance Standards [1] applicable to organ procurement organizations (OPOs) declared invalid because the Health Care Financing Administration (HCFA) exceeded its Congressional authority in enacting them and that they are arbitrary and capricious and also to enjoin the HCFA from applying those rules and standards to plaintiff and/or decertifying plaintiff based on such allegedly invalid rules and regulations. The complaint states that plaintiff received notice by letter dated March 31, 2000, that it would be decertified as an OPO on August 1, 2000, for failing to achieve and maintain four out of the five performance factors required for redesignation as an OPO for the year 2000 redesignation period based on information submitted by plaintiff for the 1998 and 1999 calendar

---

1. Final Rule, Health Care Finance Administration, *Medicare and Medicaid Programs: Conditions of Coverage for Organ Procurement Organizations,* 61 Fed.Reg. 19,722 (May 2, 1996). Administrative Record (AR) 75–113.

years. Decertification Record (DR) 5–7. Specifically, plaintiff was found to have failed to meet the requirements for extrarenal organs per million population and extrarenal organs transplanted per million population. The revised data[2] submitted to defendant on March 28th resulted in the following calculations that showed a failure of plaintiff to satisfy the criteria for recovery and transplantation of extrarenal organs:[3]

| | U.S. Mean | 75% | ARORA |
|---|---|---|---|
| Donors/Million | 21.47 | 16.10 | 16.08 |
| Kidneys Recovered/Million | 39.31 | 29.48 | 28.37 |
| Kidneys Transplanted/Million | 34.08 | 25.56 | 24.83 |
| Extrarenals Recovered/Million | 37.94 | 28.46 | 22.23 |
| Extrarenals Transplanted/Million | 34.38 | 25.79 | 21.04 |

The Court granted plaintiff's separate motion for a temporary restraining order (TRO) for a period of ten days on April 10th and extended the TRO an additional ten days by order filed on April 21st. The TRO directs the defendant to command the HCFA to cease all efforts to decertify plaintiff as the OPO serving the State of Arkansas, cease publicizing that the State of Arkansas is an open OPO service area, and cease soliciting and/or accepting any applications by other OPOs seeking to become the OPO for the State of Arkansas. By order filed on April 24th, the Court found that limited discovery might be necessary to explain the administrative record and also set a briefing schedule at the request of defendant for filing dispositive motions noting defendant's agreement to extend the TRO until May 30th. In an order filed on May 12th, the Court, upon agreement of the parties, amended the briefing schedule and extended the TRO until June 16th when the Court would hear oral argument on the summary judgment motions and hold a merged hearing on the petition for preliminary injunction and the trial on the merits. By order filed on June 8th, the Court, at the request of counsel, limited the June 16th hearing to oral argument on the dispositive motions and extended the TRO until July 6th when the merged hearing on the petition for preliminary injunction and trial on the merits would be held if the Court denied both motions for summary judgment.[4] Oral argument was held on June 16th.

On May 19th, defendant filed the AR along with a motion for summary judgment supported by brief and a separate statement of undisputed facts. Plaintiff filed its cross-motion for summary judgment on May 26th with brief, exhibits and a statement of undisputed facts. Defendant filed a reply/response on June 6th and plaintiff filed its reply on June 9th. A supporting affidavit was filed by plaintiff on June 14th. As stated above, oral argument on the motions was held on June 16th. During the argument, the Court took under submission whether to receive the Johns Hopkins report if it could be located by defendant. When defendant notified the Court the next week, her counsel was directed to file it. Plaintiff moved on June 26th for leave to conduct limited discovery on that study and responded to the study. The supplement to the administrative record was filed on June 27th. Defendant filed a response to plaintiff's motion and replied to the filing of the supplement on June 29th.

Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

---

2. The data originally submitted on January 13th was erroneous.

3. An OPO's performance is rounded up to the nearest whole number while the performance cut-offs are rounded down to the nearest whole number. DR 8

4. By fax received by the Court on July 5th, the government asked the Court, which agreed without objection by plaintiff, to postpone the hearing for one day and the government agreed to abide by the terms of the TRO until the Court enters summary judgment in favor of one of the parties or the hearing is held on July 7th.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The non-moving party may not just rest upon his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Civil Procedure Rule 56. "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir.1989).

◼ The parties agree that the standard for review of the defendant's final rules and regulations is under the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A), and the Court must determine whether the challenged agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." While the parties agree that the scope of review under the APA is usually limited to the agency's administrative record at the time of the decision, see, *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), they disagree whether an exception is presented here. As recounted above, the Court permitted plaintiff to take limited discovery finding that inquiry may be necessary to explain the administrative record. While the Court is persuaded that such supplementation by plaintiff's submissions would be appropriate, compare, *Newton Co. Wildlife Ass'n v. Rogers*, 948 F.Supp. 50 (E.D.Ark.1996), *aff'd*, 141 F.3d 803 (8th Cir.1998), the Court finds that its ultimate decision on the merits would be the same and so will confine itself to the AR and the governing legislation.

An agency's decision is arbitrary and capricious when the:

agency has relied upon factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problems, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be as-

cribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *Daisy Mfg. Co. v. Consumer Products Safety Com'n*, 133 F.3d 1081 (8th Cir.1998).

OPOs provide the services necessary in a geographical region for coordinating the identification of potential organ donors; requests for donation; and the recovery of, an equitable scheme for distribution of, and the safe transport of organs. They also work with the medical community and the public through various types of educational programs to increase public awareness of the benefits of organ donation and transplantation. See, 42 U.S.C. § 273(b)(3). Many patients in need of organ transplantation are beneficiaries under the Medicare and/or Medicaid programs.

In 1986, the OPO program was federalized which required that an OPO must be certified as a "qualified" OPO by HCFA and without such certification an OPO cannot operate. 42 U.S.C. § 1302–8(b) provided in relevant part that defendant could only provide payment under the Medicare or Medicaid programs for organ procurement costs attributable to payments made to an OPO only if it met performance-related standard prescribed by defendant. Regulations governing OPOs were first published in March of 1988.

An OPO is normally designated for only two years, and a redesignation decision typically occurs at least that often. Designation periods usually begin in the summer months of one year and expire 24 months later. Plaintiff began serving Arkansas as the designated OPO in 1987 and has served in that capacity since then.

The Transplant Amendment Act of 1990, which was enacted on November 16, 1990, amended the requirements applicable in determining whether an OPO was "qualified" so as to require that a "qualified" OPO have a "defined service area that is of sufficient size to assure maximum effec-

tiveness in the procurement and equitable distribution of organs." 42 U.S.C. § 273(b)(1)(E). The Report of the Senate Labor and Human Resources Committee dated October 25, 1990, Senate Report 101–530, provides in relevant part:

> The Committee expects the Secretary to promulgate standards under this provision that will promote both effectiveness and efficiency among OPOs. This standard should include effectiveness in equitable donor sharing and efficiency in maximizing the number of donors nationally as opposed to any one OPO service area. The Committee notes in particular, that a standard of retrieving a specified number of organ donors per million population would not, by itself, satisfy these requirements. A small OPO might well be able to meet such a standard, but at an unacceptable high cost per organ. Moreover, since organ retrieval cannot be expected to be uniformly successful throughout the country, some OPOs, under this standard, might be able to serve areas of high yield, leaving other OPOs with the difficult task of trying to succeed in areas of low yield.

Defendant published a Proposed Rule in June of 1991 that made several proposals for performance standards which included a minimum numerical ratio of cadaveric kidneys procured and transplanted per million population, similar performance standards for the procurement of hearts and livers, a cost-per-organ analysis, and a formula to calculate the expected number of donors per year for each OPO based on such factors as age, race and gender. A recommendation referenced at AR 648 based on population and potential activity benchmarks was forwarded by the Association for Organ Procurement Organizations (AOPO) to which the Proposed Rule commented as follows:

> The Association recommends that an OPO be required to demonstrate that it achieves at least 75 percent of the national means for per capita organ recovery in four of the following performance categories over the previous two year calendar year period. The national means would be derived from the experience of designated OPO's in these categories:
>
> —Actual donors per million population.
>
> —Number of kidneys recovered per million population.
>
> —Number of kidneys transplanted per million population.
>
> —Extrarenal organs recovered per million population.
>
> —Actual number of extrarenal organs transplanted per million population.
>
> Under this performance standard, failure to achieve 75 percent of the national means in four of the five categories would require an investigation to determine why the OPO did not achieve minimum goals. If an investigation determines that the OPO's inefficiency, poor management, or like reasons are the major cause of the low performance, then termination action would be initiated.

The AOPO recommendation itself is not part of the record. The only data listed in the AR for the proposed rule is *The Potential Supply of Organ Donors: An Assessment of the Efficiency of Organ Procurement Efforts in the United States*, AR 656–694, also known as the Battelle study. However, in the June 6th reply and at the June 16th oral argument, counsel for defendant stated that the Battelle study did not even address the performance standards that were adopted by defendant, but instead criticized the use of a static number for measuring OPO performance so the Battelle study does not undermine the performance standards adopted by the defendant.

The Battelle study, which cites to 82 studies and articles, did concern assessing the organ donor potential of an area. Excerpts from that study follow:

> The geographic organ donor database upon which this analysis is based is principally comprised of mortality data (by

cause of death), detailed demographic data, and data on transplantation and other medical services. AR 667

Every death with an underlying or contributory cause known to be a contraindication to kidney donation—the more liberal of solid organ donor criteria—was eliminated as a potential donor. AR 668

[O]ut of hospital deaths were excluded from the analysis. AR 668

Potential donors were further restricted by age. To qualify, potential donors had to fall between the ages of six months and 65 years. AR 668

Organ procurement rates vary widely by state and region. AR 671

[E]fficiency may vary for year-to-year. AR 682

[T]he results of our study clearly indicate that it is inappropriate to generalize estimates from studies conducted in small areas, such as individual states, to the population as a whole. This is due to the fact that there are marked geographic variations in the characteristics of the population and, hence, the supply of potential organ donors will differ. AR 684.

Insufficiency may be justified in circumstances where the actual performance of organ procurement personnel is beyond the control of individual states and OPOs. For example, social, cultural, religious, or moral barriers to organ donation are not easily modified through either educational efforts or changes in federal or state laws.

Therefore, the attribution of blame for poor performance in organ procurement should be withheld until all possible explanations have been evaluated. AR 685.

Comments received from to the Proposed Rule included:

Only 8% of kidney donors are black. AR 497

There is no easy formula and that is why we emphasize that OPOs that do not meet the criteria (qualifying or performance) should be given the opportunity to explain differences and submit a plan of corrective action. AR 563

[W]hile an OPO may be effective in getting referrals, there are many difficulties in bringing a referral of brain death patient to fruition as a procured donor. This may relate to the donor's medical condition, the nature and extent of injuries, the maturity, and stability of the family, the family educational and financial background, and other circumstances that cannot be influenced by effective organ procurement strategies or management. AR 600

The proposed AOPO criteria using national recovery statistics is the most rational of those presented. However, the denominator used (OPO) population base is open to question. OPOs should be given the opportunity to explain difference between their assigned and actual population base. Such differences should take into account when determining performance. AR 401–402

After receiving such comments from individual OPOs and AOPO, an Interim Final Rule was proposed by HCFA on September 8, 1994. This rule adopted the portion of the AOPO proposal concerning the 75% of national means in four of the five categories, but did not include the part that would require an investigation to determine why the OPO did not achieve minimum goals. At AR 326, HCFA noted that several comments had stated that an OPO should be provided with an opportunity to improve its performance before losing its designation such as submission of a corrective action plan and demonstrating that it could improve to meet the performance standards. The response at AR 326 states:

> We agree that there may be extenuating circumstances that could prevent an otherwise efficient and effective OPO from meeting all of the performance standards at the time of redesignation.

Later at AR 330, the agency observed the concerns of some comments and responded:

Although we continue to believe there is merit in a formula-based approach to performance monitoring, we have decided not to go forward with one at this time. There are significant advantages to the formula. The factors in the formula significantly influence expected donation rates. They are relatively stable for a given area over time, published by reputable sources, and readily available.

, Although the agency states that "[w]e believe that a threshold set at 75% of the mean provides ample opportunity for variation in OPO performance and recognizes individual structural and size difference while ensuring that some objective measure of effectiveness is met," the basis for that number is the AOPO proposal minus an important component.

Once the Interim Final Rule was published, numerous comments were critical of the proposed performance standard for not taking into account the potential donor pool for an area. See, AR 155, 159, 187, 208, 209, 233, and 242. AOPO's comments can be found at AR 50–54. AOPO, in commenting about population data, stated:

> AOPO recommends that population data, while clearly flawed, continue to be used pending identification or development of alternatives. Hospital death record data provide the most accurate assessment of the true potential donor population in an OPO service area. Standardized death record criteria and methodology should be developed and implemented by all OPOs. If an OPO fails to meet the national standards based on population statistics, the death record data should be used to determine if the OPO is actually failing to perform to its potential. These data can then be used by the OPO to identify where deficiencies are occurring and develop a targeted plan to bring the OPO into compliance. By working with death record data we may eventually be able to move to a system based entirely on true donor potential. HCFA can assist AOPO in accomplishing this task by requiring its Medicare hospitals to cooperate with the OPOs in performing death record reviews.
> ****

AOPO recommends that OPOs be given an opportunity to examine adjusted death data to allow them to explain their performance.

The Final Rule as to performance standards states:

> (b) Standards beginning on January 1, 1996. Except as specified in paragraph (c) of this section, each OPO must achieve at least 75 percent of the national mean for four of the following five performance categories, averaged over the 2 calendar years before the year of redesignation:
>
> (1) Number of actual donors per million population.
>
> (2) Number of kidneys recovered per million population.
>
> (3) Number of extrarenal organs recovered per million population.
>
> (4) Number of kidneys transplanted per million population.
>
> (5) Number of extrarenal organs transplanted per million population.

It addressed the mandatory nature of the 75% performance standard without opportunity to explain or for corrective action in part as follows:

> We believe that the establishment of primary performance standards at 75 percent of the national average is a reasonable standard. We hold no OPO accountable to an arbitrary number but rather look only to its peers. We are not aware of geographical factors that by themselves make it impossible for an OPO to meet the standards in certain service areas. Rather with a 25–percent margin of error off the mean, we believe that the most influential factor to performances is the OPO itself.

The Certificate contained in the June 27th supplement states that the document is a true and accurate copy of a report entitled *Characteristics of Donor and Non–Donor Hospitals in the United*

*States* that is referenced in the preamble to the 1996 Final Rule (AR 89) and that study has been referred to as the Johns Hopkins University research used in promulgating the OPO performance standards. However, the second sentence of page 5 of that study states "[a]s of July, 1997, the waiting list for all types of cadaveric organs included more than 53,000 registrations (1)." At page 17 of the study under References, the corresponding reference states "United Network for Organ Sharing. Number of Patient Registrations on the National Transplant Waiting List 6/30/97. The UNOS Bulletin 1997; 2:6." Thus, a question is raised as to whether that document relying on a 6/30/97 list is indeed the "recent research from the Johns Hopkins University" that is referenced in the Final Rule published in the Federal Register over a year earlier on May. 2, 1996.

 Defendant chose the 75% standard from the AOPO recommendation. However, the AOPO clearly stated that such data was flawed and so an opportunity needed to be given to an OPO which did not meet that standard to explain its performance to see if it actually failed to meet its potential. Defendant, without any support from studies or evaluations as to the various factors identified by the commenters as to geographical factors that influence the efficiency of an OPO's service area, appears to have relied on her own impact analyses of existing OPOs using the proposed Performance Standards that assume that geographical factors would not make it impossible to meet the 75% standard. Thus, there is no evidence to support HCFA's beliefs especially in the face of all the documentation including that relied upon by the commenters that strict adherence to the 75% standard without examination of specific and pertinent factors would not be an accurate measure of efficiency. Such a Final Rule and Performance Standards conflict with the 1990 Act and the

limited evidence contained in the administrative record.[5]

The Court finds that the Final Rule and Performance Standards contained in the May 2, 1996 Final Rule for *Medicare and Medicaid Programs: Conditions of Coverage for Organ Procurement Organizations (OPOs)*, 61 Fed.Reg. 19,722 is arbitrary, capricious and an abuse of discretion in violation of the Administrative Procedure Act. Defendant is permanently enjoined from applying the Final Rule and Performance Standards to plaintiff and from decertifying plaintiff as an OPO based on that rule and standards.

Accordingly, plaintiff's May 26th motion (# 30) for summary judgment is granted thereby rendering its April 6th motion (# 2) for preliminary injunction and June 26th motion (# 40) for leave to conduct limited discovery concerning the study moot. Defendant's April 10th motion (6) to dismiss and May 19th motion (# 24) for summary judgment are denied. The Final Rule and Performance Standards contained in the May 2, 1996 *Final Rule for Medicare and Medicaid Programs: Conditions of Coverage for Organ Procurement Organizations (OPOs)*, 61 Fed.Reg. 19,722 is found to be arbitrary, capricious and an abuse of discretion in violation of the Administrative Procedure Act. Defendant is permanently enjoined from applying the Final Rule and Performance Standards to plaintiff and from decertifying plaintiff as an OPO based on same. A separate judgment will be entered.

### JUDGMENT

In accordance with the separate order filed this date, summary judgment is entered in favor of plaintiff and against defendant. The Final Rule and Performance Standards contained in the May 2, 1996 Final Rule for Medicare and Medicaid Programs: Conditions of Coverage for Organ Procurement Organizations (OPOs), 61

5. If the submissions outside the administrative record had been considered, they would only bolster the Court decision.

Fed.Reg. 19,722 is found to be arbitrary capricious and an abuse of discretion in violation of the Administrative Procedure Act. Defendant is permanently enjoined from applying the 1996 Final Rule and Performance Standards to plaintiff and from decertifying plaintiff as an organ procurement organization based on same. Defendant is specifically directed to command the Health Care Financing Administration to cease any efforts to decertify plaintiff as the organ procurement organization serving the State of Arkansas, cease any publication that the State of Arkansas is an open organ procurement organization service area, and cease any solicitation and/or acceptance of any applications by other organ procurement organizations seeking to become the organ procurement organization for the State of Arkansas.